# McFADDEN & SHOREMAN, L.L.C.

## Attorneys at Law

1900 L Street, N.W., Suite 502, Washington, D.C. 20036

Telephone: (202) 638-2100

Facsimile: (202) 638-6783

## FACSIMILE COVER SHEET

Date:          1-Jun-05

Number of Pages:    42

(including this page)

Facsimile: (412) 279-9781

Telephone:

| Recipient's Information | Sender's Information |
|---|---|
| To: Bob Montenari | From: John Shoreman |
| Of: | Sent by: |
| Re: | Client No    2238 |

Comments:

The information contained in this facsimile message is information protected by attorney-client and/or attorney work product privilege. It is intended only for use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any reader of this facsimile is not the named recipient of the employee or agent responsible to deliver to the named recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If you received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the U.S. Postal Service.

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE NOTIFY US IMMEDIATELY AT (202) 638-2100.

# McFadden & Shoreman, L.L.C.

### ATTORNEYS AT LAW

1900 L STREET, N.W.
SUITE 602
WASHINGTON, DC 20036
TELEPHONE (202) 638-2100
TELECOPIER (202) 638-6783

DOUGLAS B. McFADDEN*
JOHN M. SHOREMAN**
THOMAS L. JONES***

*ALSO ADMITTED IN NEW YORK, INDIANA
**ALSO ADMITTED IN NEW YORK
***OF COUNSEL

June 1, 2005

## VIA FAX TRANSMISSION & REGULAR MAIL

Mr. Robert Montenari
Pizza Outlet, Inc. (Vocelli Pizza)
2101 Greentree Road, Suite A-202,
Pittsburgh, PA   15220

Re.    *Burak Kotan, et al. v. Pizza Outlet, Inc.*

Dear Mr. Montenari:

Please advise whether Vocelli Pizza, LP, consents to the court's entry of the Temporary Restraining Order, as requested in the attached Application, Memorandum in Support and Affidavit

Yours truly,

John M. Shoreman

## IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA
### (Civil Division)

| | |
|---|---|
| **BURAK S. KOTAN**<br>**854 Quince Orchard Boulevard**<br>**Suite 101**<br>**Gaithersburg, MD 20878; and**<br><br>**MB GROUP, INC.**<br>**854 Quince Orchard Boulevard**<br>**Suite 101**<br>**Gaithersburg, MD 20878; and**<br>                    **Plaintiffs,**<br><br>                 **v.**<br><br>**PIZZA OUTLET, INC.**<br>**112 Abbeyville Road**<br>**Mount Lebanon, PA  15228; and,**<br><br>**VOCELLI PIZZA, LP**<br>**2102 Greentree Road**<br>**Suite A-202**<br>**Pittsburgh, PA  15220**<br>                    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Civil Action No.**<br><br>)     **JUDGE IN CHAMBERS**<br> |

## APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER

Plaintiffs, Burak S. Kotan and MB Group Inc., by their attorneys, hereby move

this court, pursuant to S.C.R.Civ. Pro. 65, for a temporary restraining order ("TRO"), in

the form submitted herewith, restraining Defendants, Pizza Outlet, Inc. and Vocelli Pizza,

LP, from terminating on June 2, 2005, an exclusive Development Agreement, which

Defendants entered into with Kotan and his former business partner, Mert Onur, on

February 20, 2004. (Exhibit 1) The Development Agreement provides Kotan and Onur

exclusive rights to build and operate a franchised chain of at least six(6) pizza outlets

operating in D.C. under the Vocelli tradename. MB Group, Inc. was formed by Kotan

and Onur to develop and operate the franchise. Even though the Development Agreement contains a termination date of June 1, 2007, Defendants have stated their intent to terminate as of June 2, 2005. (Exhibit 2) A TRO is necessary to maintain the status quo pending a resolution of Plaintiffs' claims of breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference. Because Plaintiffs' exclusive right to develop and operate Defendants' franchise in the D.C. is threatened, Plaintiffs are confronting immediate and irreparable injury. No adequate remedy at law exists. Plaintiffs sought the consent of Defendants for entry of a TRO, but have not received a response as of this filing.

WHEREFORE, Plaintiffs pray this court to enter a temporary restraining order in the form attached. In support of this motion, Plaintiffs submit the affidavit of Baruk S. Kotan, and a supporting memorandum of law.

Dated: June 1, 2005

Respectfully Submitted,
McFADDEN & SHOREMAN

John M. Shoreman, #407626
1900 L Street, N.W.
Suite 502
Washington, D.C. 20036
(202) 828—4400

Athan T. Tsimpedes, #452341
1900 L Street, N.W.
Suite 502
Washington, D.C. 20036
(202) 223-6080

*Attorneys for Plaintiffs*

2

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)

| | | |
|---|---|---|
| BURAK S. KOTAN, et al., | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| PIZZA OUTLET, INC., et al., | ) | **JUDGE IN CHAMBERS** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES TO THE APPLICATION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER

Plaintiffs, Burak S. Kotan and MB Group, Inc., in support of their Application for a temporary restraining order, respectfully show the following.

### BACKGROUND

Defendant Pizza Outlet, Inc. is the general partner of Defendant Vocelli Pizza, LP. Defendants are headquartered in Pittsburgh, Pennsylvania. Defendants are franchisors of chain pizza outlets operating under the tradename Vocelli's Pizza. Defendants were seeking an exclusive franchisee comprised of qualified investors and operational personnel to develop and operate Vocelli Pizza outlets within D.C. (Kotan Aff., ¶ 1). Kotan became interested in the franchise opportunity offered by Defendants. Defendants required a full-time, operating partner to undertake the project. Kotan formed an initial partnership with Mert Onur, eventually they formed MB Group Inc. specifically for purposes of developing the franchise. Onur was experienced in the restaurant and fast food industry. Onur's operational role required him to perform the functions of managing partner and oversee day-to-day operations and manage the outlets, as required by Defendants. Kotan provided business planning and 100 percent of the financing for

the franchise project. (Kotan Aff., ¶ 2). Eventually, Kotan and Onur entered into a Development Agreement (the "Agreement") with Defendants. (Exhibit 1). By virtue of the Agreement, Kotan and Onur (and subsequently MB Group, Inc.) gained an exclusive right to develop and operate six Vocelli Pizza outlets in the D.C. (Exhibit 1). The Agreement contemplated construction of the pizza outlets over a three(3) year schedule. A termination date of June 1, 2007, is established in the Agreement. Kotan paid an initial franchise fee of Thirty Thousand Dollars ($30,000.00) to Defendants under the terms of the Agreement. (Kotan Aff., ¶ 3).

Kotan relied on Onur for his expertise in the restaurant industry, as well as his commitment to manage and operate the Vocelli outlets. Kotan himself invested substantial time, effort and money to develop the franchise, including: the location of suitable commercial space, the design of outlet layouts and plans, the development of a business plan, and securing of additional financing. Trust, loyalty and reliance were forged between Kotan and Onur as they undertook their respective responsibilities to each other and to Defendants under the Agreement. (Kotan Aff., ¶ 4).

The Agreement required Onur, as operating partner, to "attend and successfully complete" Defendants "certified management training program". (Exhibit 1). After executing the Agreement, Onur was provided the necessary training with a Vocelli franchisee located in Virginia. While training Onur, Defendants and their agents intentionally interfered with the business relationship between Kotan and Onur by inducing Onur to renege on his obligations to Kotan and MB Group, Inc. at a critical point in time in the D.C. franchise development project. With Defendants' approval and consent, Onur eventually became a full-time store manager with a Vocelli Pizza

2

franchisee operating in Virginia and Florida. (Kotan Aff., ¶ 5)  Without Onur, Kotan and

MB Group, Inc. are incapable of developing and operating the outlets as anticipated.

Defendants have now provided Kotan with notice of their intent to terminate the

Agreement as of June 2, 2005, because of a failure to meet the construction schedule,

even though the failure to meet the construction schedule results from Defendants

wrongful acts. (Exhibit 2; Kotan Aff., ¶ 6).

## ARGUMENT

A temporary restraining order may be granted when a party demonstrates: (1) a

substantial likelihood on the merits; (2) that irreparable injury will result in the absence of

the requested relief; (3) that no other parties will be harmed if temporary relief is granted;

and (4) that the public interest favors entry of a temporary restraining order.  Stewart v.

DC Armory Bd., 789 F. Supp. 402, 404 (D.D.C. 1992), citing Washington Metropolitan

Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 843 (DC Cir. 1977);

accord Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 921,

925 (DC Cir. 1958).  "The test is not a wooden one ... [since] relief may be granted with

either a high probability of success or some injury, or vice versa." Id., citing Cuomo v.

U.S. Nuclear Regulatory Commission, 772 F.2d 972, 974 (DC Cir. 1985) (per curium).

This case in all respects presents a classic example of a need for a restraining order.

Defendants' conduct has disturbed the status quo that existed prior to the filing of this

temporary restraining order and, if unchecked, will render the administration of justice in

this case impossible. See e.g. C. WRIGHT AND A. MILLER, Fed. Pract. and Proc..,

sec. 2951

A TRO is especially appropriate to "preserve the existing situation in its status quo until the Court has an opportunity to pass on the merits of the situation." Jews For Urban Justice v. Wilson, 311 F. Supp. 1158, 1159 (D.D.C. 1970) (citation omitted); see also Armstrong v. Bush, 807 F. Supp. 816, 821 (D.D.C. 1992)(TRO granted to preserve status quo, and would " not be disruptive or overly burdensome upon the Defendants"). The term status quo in the context of a preliminary injunction "has been interpreted to refer to the last uncontested set of facts preceding the pending controversy." In re Antioch University, 418 A.2d 105, 110 (DC App. 1980)(citation omitted). See also Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986)(upholding grant of preliminary injunction to preserve the status quo). Without a TRO, Defendants will have a license to disrupt and wreck the status quo before Plaintiffs can be heard on their motion for preliminary injunction. But for the Defendants conduct, Kotan and MB Group, Inc. would be developing and operating the franchise outlets as contemplated in the Agreement. Defendants caused a delay in the construction schedule and now seek to use that delay to terminate the Agreement. Termination means the forfeiture of Kotan's investment and business opportunities. MB Group, Inc. will cease its existence. Defendants intend to retain the $30,000 paid by Kotan.

A.     **Kotan Has an Overwhelming Likelihood of Success on the Merits.**

    1    **Defendants Violated the Covenant of Good Faith and Fair Dealing Implied in the Development Agreement.**

Under the law of the District of Columbia, a covenant of good faith and fair dealing is implied in every agreement. Willens v. 2720 Wis. Ave. Coop Ass'n, 844 A.2d 1126, 1135 (D.C. 2004)(quoting Hais v. Smith, 547 A.2d 986, 987 (D.C. 1988). The Agreement between Kotan and Defendants, required the Defendants not interfere with the

ability of Kotan to perform his obligations. Defendants required that Kotan recruit an operational partner who met their stringent requirements and who would supervise the day-to-day operations and development activities of the D.C. franchise. Defendants were therefore aware that Onur's participation was critical when they and their agents intentionally induced him to renege on his obligations. Kotan's ability to perform under the Agreement thereafter was frustrated by the conduct of Defendants in violating their implied covenant of good faith and fair dealing with Kotan under the Agreement.

### 2. Kotan Faces Certain Injury Resulting From Defendants Imminent Termination of the Development Agreement.

Kotan seeks injunctive relief to protect the status quo by keeping in force the Agreement that is set to be expire on June 2, 2005. Defendants' conduct frustrated the purpose of the Agreement and now jeopardizes the viability of Kotan's business. Injunctive relief is not only appropriate, but also essential to keep the status quo without which Kotan's business will cease to exist.

Kotan also brings a claim for tortious interference with contract and prospective business advantage, and civil conspiracy, because Defendants' acts strike at the very heart of MB Group Inc.'s ability to survive in its current form. There is no question that Defendants induced Onur to leave Kotan, he presently works as an operating partner for another Vocelli Pizza franchisee with Defendants explicit consent and approval.

### B. Kotan Will Suffer Irreparable Harm If Injunctive Relief is Not Awarded.

Plaintiffs will suffer imminent, substantial and irreparable injury if Defendants are permitted to terminate the Agreement in defiance of their covenants and their duty not to interfere with the ability of Plaintiffs to perform under the Agreement. The courts of the District of Columbia have repeatedly found injunctive relief to be appropriate in cases

where the existence of a business is in jeopardy. see Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (destruction of a business constitutes irreparable harm), Perpetual Building Limited Partnership v. District of Columbia, 618 F. Supp. 603, 616 (D.D.C. 1985).

Money damages in this case provide an inadequate remedy. Most fundamentally, this case involves more than an easily calculated decline in revenue. It involves misconduct that threatens the very existence, future and character of Kotan's business. Thus, D.C. law recognizes that monetary loss, even if theoretically recoverable, may constitute irreparable harm "where the loss threatens the very existence of the movant's business," Wisconsin Natural Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669, 674 (D.C. Cir. 1985); see Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (destruction of a business constitutes irreparable harm), Perpetual Building Limited Partnership v. District of Columbia, 618 F. Supp 603, 616 (D.D.C. 1985)(same); Stanley-Fizer Associates, Inc. v. Sport-Billy Productions Roif Devhle, 608 F. Supp. 1023, 1035 (S.D.N.Y. 1985) ("commercially life-threatening' loss of business can constitute irreparable harm).

The termination of exclusive rights afforded to Kotan to will become effective on June 2, 2005, unless the injunction issues. Kotan will forever lose those exclusive rights. Additionally, Kotan will lose his investment of $30,000.00. Kotan will also lose his business opportunity, and the business entity MB Group, Inc, that was created specifically to develop and operate the pizza outlets in D.C. will cease to operate. Therefore, Kotan and MB will suffer immediate and irreparable harm if the injunction does not issue.

**C.**   **The Balance of the Equities Favors Kotan**

The equities in this case tilt dramatically in favor of injunctive relief. Defendants interfered with Kotan's ability to perform under the Agreement. Defendants have violated the implied covenants of good faith and fair dealing by seeking to terminate the Agreement on June 2, 2005. The deprivation Defendants may suffer from being held to their bargain does not rise to a level of harm that is equitably cognizable.

**D.**   **The Issuance of an Injunction on Behalf of Kotan Would Serve the Public Interest**

The public has an interest in insuring that parties do not cause harm or frustrate the other party when fulfilling obligations under an agreement. Commercial transactions seek to promote business relations through agreements freely and fairly, without one party interfering with the other party's ability to perform under the agreement, so as to take an unfair advantage or benefit. The public further has an interest in ensuring that contracts are not interfered with by a party so as to frustrate its purpose as that may have a chilling effect upon the way business is practiced. The courts' willingness to issue injunctions to enforce and protect the status quo is evidence that the public interest is served by this relief.

**CONCLUSION**

Under the circumstances, to restore and preserve the status quo, a TRO designed to prevent the wrongful and unlawful actions taken by Defendants should be issued by the Court, pending a hearing on a broader Motion for Preliminary Injunction to be filed.

Dated: June 1, 2005

Respectfully Submitted,
McFADDEN & SHOREMAN

John M. Shoreman, #407626
1900 L Street, N.W.
Suite 502
Washington, D.C. 20036
(202) 828—4400

Athan T. Tsimpedes, #452341
1900 L Street, N.W.
Suite 502
Washington, D.C. 20036
(202) 223-6080

*Attorneys for Plaintiffs*

8

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)

BURAK S. KOTAN, et al.,          )
               Plaintiffs,          )
                        )
                        )
           v.          )          Civil Action No.
                        )
PIZZA OUTLET, INC., et al.,          )          JUDGE IN CHAMBERS
                        )
          Defendants.          )
                        )

## AFFIDAVIT OF BURAK S. KOTAN

District of          )
Columbia          )ss:

     I, Burak S. Kotan, hereby swear that the facts set forth below are known to me personally and are true and correct.

    1.    Defendant Pizza Outlet, Inc  is the general partner of Defendant Vocelli Pizza, LP.  Defendants are headquartered in Pittsburgh, Pennsylvania. Defendants are franchisors of chain pizza outlets operating under the tradename Vocelli's Pizza. Defendants were seeking an exclusive franchisee comprised of qualified investors and operational personnel to develop and operate Vocelli Pizza outlets within D.C

    2.    I became interested in the franchise opportunity offered by Vocelli Pizza ("Vocelli").  Vocelli requires a full-time, operating partner. I formed an initial partnership with Mert Onur, eventually our partnership became MB Group Inc., which was formed specifically for purposes of developing the Vocelli franchise.  Onur was experienced in the restaurant and fast food industry.  Onur's operational role required him to perform the functions of managing partner and oversee day-to-day operations and manage the outlets, as required by Vocelli.  I provided business planning and 100 percent of the financing for the franchise project.

    3.    Eventually, Onur and I entered into a Development Agreement (the "Agreement") with Vocelli.  By virtue of the Agreement, we received an exclusive right to develop and operate six Vocelli Pizza outlets in the D.C. (Exhibit 1).  The Agreement contemplated construction of the pizza outlets over a three(3) year schedule.  A termination date of June 1, 2007, is established in the Agreement. I paid Vocelli an initial franchise fee of Thirty Thousand Dollars($30,000.00) under the terms of the Agreement

4.   I relied on Onur for his expertise in the restaurant industry, as well as his commitment to manage and operate the Vocelli outlets. I myself invested substantial time, effort and money to develop the franchise, including: the location of suitable commercial space, the design of outlet layouts and plans, the development of a business plan, and the securing of additional financing. Trust, loyalty and reliance were forged between Onur and myself as we undertook our respective responsibilities to each other and to Vocelli under the Agreement.

5.   The Agreement required Onur, as operating partner, to "attend and successfully complete" Vocelli's "certified management training program". (See Exhibit 1) After executing the Agreement, Onur was provided the necessary training with a Vocelli franchisee located in Virginia. While training Onur, Defendants and their agents intentionally interfered with my business relationship with Onur by inducing him to renege on his obligations to me and the MB Group, Inc. at a critical point in time in the D.C. franchise development project. With Defendants' approval and consent, Onur eventually became a full-time operating partner with a Vocelli Pizza franchisee operating in Florida.

6.   Without Onur, MB Group, Inc. and I are incapable of developing and operating the outlets as anticipated. Vocelli has now provided me with notice of their intent to terminate the Agreement as of June 2, 2005, purportedly because of a failure to meet the construction schedule; even though the failure to meet the construction schedule results from Vocelli's own wrongful acts.

Further your affiant sayeth not.

_____
Burak S. Kotan

Subscribed and sworn before me this 1st day of June, 2005:

_____
Notary Public

Sonia Lea Bodzkony
Notary Public
District of Columbia
My Commission Expires Dec. 14, 2005

2

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)

BURAK S. KOTAN, et al.,           )
                    Plaintiffs,   )
                                  )
                                  )
          v.                      )
                                  )      Civil Action No.
                                  )
PIZZA OUTLET, INC., et al.,       )      JUDGE IN CHAMBERS
                                  )
              Defendants.         )
_____)

## EX PARTE RESTRAINING ORDER

Upon consideration of Plaintiffs' motion for an ex parte temporary restraining order, and supporting memorandum and affidavit, and for good cause shown, the motion is hereby GRANTED this 1st day of June, 2005; and it is further,

ORDERED that:

(1)     Defendants Pizza Outlet, Inc and Vocelli's Pizza, LP, its agents and those acting in concert with them are restrained from selling or granting rights to any franchisee of of pizza outlets in the District of Columbia;

(2)     Defendants and their agents, and those acting in concert with them, shall not terminate the Development Agreement with Plaintiffs, and shall take no further action to terminate said Agreement .

(3)     Defendants and their agents shall not interfere with Burak Kotan or MB Group, Inc. in business operations relating to the Development Agreement.


_____
JUDGE, SUPERIOR COURT FOR
THE DISTRICT OF COLUMBIA

Copies to:

John M. Shoreman
Athan T. Tsimpedes
1900 L Street, N.W., Suite 502
Washington, D.C. 20036

PIZZA OUTLET, INC.
Harry Ablak, President
112 Abbeyville Road
Mount Lebanon, PA 15228

VOCELLI PIZZA, LP
Robert Montanari, Director
2102 Greentree Road
Suite A-202
Pittsburgh, PA 15220

**EXHIBIT 1**

# VOCELLI® Pizza DEVELOPMENT AGREEMENT

**THIS DEVELOPMENT AGREEMENT** (the "Agreement") is made and entered into this _18th_ day of ___February___, 2004, by and between **PIZZA OUTLET, INC.**, a Pennsylvania corporation, with its principal office at 2101 Greentree Road, Suite A-202, Pittsburgh, Pennsylvania 15220 ("PO") and ___Burak S Kotan and Mert Onur___ whose principal address is ___854 Quince Orchard Blvd. #101 Gaithersburg, MD 22878___ ("DEVELOPER").

## INTRODUCTION

PO, as the result of the expenditure of time, skill, effort and money, has developed and owns a distinctive system relating to the establishment and operation of retail outlets for the sale of pizza and other products (hereinafter "System").

The distinguishing characteristics of the System include, without limitation, certain exterior and interior design, decor, color scheme and furnishings; special recipes and menu items; uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; procedures for inventory and management control; training and assistance; and advertising and promotional programs; all of which may be changed, improved and further developed by PO from time-to-time.

PO identifies the System by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including the "PIZZA OUTLET®" and "VOCELLI™" Pizza name, logo and such other trade names, service marks and trademarks as are now designated (and may hereafter be designated by PO in writing) for use in connection with the System (hereinafter referred to as "Proprietary Marks").

PO continues to develop, use and control the use of such Proprietary Marks in order to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance and service.

DEVELOPER desires to enter into the business of operating PIZZA OUTLET® or VOCELLI™ Pizza stores ("STORES") under the System and wishes to obtain franchises from PO, as well as to receive the training and other assistance provided by PO, for that purpose.

1.    **GRANT OF DEVELOPMENT RIGHTS**

    **A.**    PO grants to Developer, subject to all the terms, conditions and provisions herein, the right to develop STORES in the area (the "Development Area") described in Exhibit "A" of this Agreement.

    **B.**    Subject to the provisions contained herein, this Agreement shall be for a term commencing on the date hereof and expiring on the date set forth in Exhibit "B" of this Agreement.

2.    **RESERVATION OF DEVELOPMENT RIGHTS**

    **A.**    PO retains the right to sell its products within the Development Area through dissimilar channels of distribution.  For purposes of this Agreement, dissimilar channels of distribution shall include, without limitation, sales of product to supermarkets and other resellers.

    **B.**    PO expressly <u>excludes</u> from this grant the right to sell, by delivery or otherwise, products or services to or in major airports, amusement parks and professional sports facilities.  DEVELOPER acknowledges and agrees that such facilities present special, valuable and unique opportunities for the sale of products and/or services, and that PO has expressly reserved the right to develop such opportunities on its own or by the sale of exclusive or nonexclusive franchises to third parties.  DEVELOPER does not possess any right of first refusal or other right with regard to such facilities.

    **C.**    DEVELOPER acknowledges and agrees that such non-traditional locations such as college campuses, hospitals and government facilities, and during special events such as fairs, carnivals, sporting events, etc. present special, valuable and unique opportunities for the sale of products and/or services.  PO hereby grants to DEVELOPER, the right of first refusal described below with regard to any franchise to develop a STORE or STORES at such non-traditional locations within the Development Area where PO may at some point determine that a STORE is to be developed.

        (1)    If PO shall desire to develop a STORE or STORES in any of the non-traditional locations within the Development Area described in Section 2.C above, it shall, at least ninety (90) days prior to granting such franchise, send written notice of such decision (the date on which such notice is sent is hereinafter referred to as the "Notice Date") to DEVELOPER and offer to franchise such STORE upon the terms and conditions of this Agreement.  Such offer shall remain open to DEVELOPER until the expiration of the thirtieth (30th) day following the Notice Date (the "Purchase Option").

        (2)    Acceptance of the Purchase Option by DEVELOPER must be made by written notice to PO.  Following such acceptance, DEVELOPER must enter into a

attached as Exhibit "C") with PO for such non-traditional location prior to the expiration of the ninetieth (90th) day following the Notice Date.

      **D.**     If DEVELOPER shall fail to accept the Purchase Option or fail to enter into the Franchise Agreement by the deadlines set forth above, the Purchase Option shall immediately terminate and PO may develop the STORE itself or franchise the STORE to a third party.

## 3.    RIGHTS IN DEVELOPMENT AREA

      **A.**     Provided DEVELOPER: (i) is in full compliance with the terms and conditions contained in this Agreement, including, without limitation, the development obligations contained in Section 4, and (ii) is in full compliance with all obligations under Franchise Agreements previously or hereafter entered into with PO, then during the term, and subject to all other provisions of this Agreement:

      **(1)**     PO will grant to DEVELOPER franchises for the ownership and operation of STOREs located within the Development Area.

      **(2)**     PO will not operate (directly or through an affiliate), nor grant a franchise for the operation of STOREs to be located within the Development Area, except (i) such franchises as are granted to DEVELOPER pursuant to this Agreement; and (ii) pursuant to Section 2 above.

      **B.**     At the expiration of the term of this Agreement as set forth in Exhibit "B", the exclusive nature of the Development Area will terminate; however, if DEVELOPER has fulfilled its obligations under this Agreement and is in compliance with all other agreements with PO, DEVELOPER will be given a first right of refusal for the further development of STOREs in the former Development Area. Such right will be effective until such time as DEVELOPER first elects not to exercise such right at which time DEVELOPER will have no remaining development rights hereunder. The terms of such right of first refusal shall be identical to those set forth in Section 2.D above.

      **C.**     Additionally, each STORE opened pursuant to this Agreement or pursuant to a separate Franchise Agreement, will maintain the specific geographic area reserved for exclusive delivery (the "Protected Delivery Zone") as such term is defined in the Franchise Agreement.

## 4.    DEVELOPMENT OBLIGATIONS

      **A.**     DEVELOPER agrees during the term of this Agreement and any extensions thereof that he will at all times faithfully, honestly, and diligently perform his obligations hereunder and that he will continuously exert his best efforts to promote and enhance the development of STOREs within the Development Area.

B.     Without limiting the foregoing obligation, DEVELOPER agrees to have open and in operation the cumulative number of STORES (the "Minimum Development Obligation") by the dates set forth in Exhibit "B" of this Agreement (the "Development Schedule").

C.     If a STORE is permanently closed after having been opened, DEVELOPER will develop and open a substitute STORE within one (1) year from the date of its permanent closing.

## 5.     DEVELOPMENT FEE

Concurrent with the execution of this Agreement, DEVELOPER shall pay to PO a nonrefundable, fully earned Development Fee calculated as follows: (1) Fifteen Thousand Dollars ($15,000) for the first STORE; and (2) Three Thousand Dollars ($3,000) for each additional STORE to be opened according to the Development Schedule ("Development Fee"). The Development Fee shall be applied to the initial franchise fees payable under each franchise agreement executed pursuant to this Agreement. The Development Fee is in consideration for this Agreement and not in consideration for any franchise agreement and is nonrefundable notwithstanding any provision to the contrary contained in any franchise agreement. The balance of the initial franchise fees payable pursuant to each franchise agreement executed pursuant to this Agreement shall be due as specified in Section 6.

## 6.     FRANCHISE AGREEMENTS

A.     DEVELOPER agrees that each STORE developed under this Agreement will be established and operated under a separate, then current franchise agreement (substantially in the form of the now current Franchise Agreement attached hereto as Exhibit "C") including the then current royalty fee, which shall not exceed five percent (5%), and required advertising fees, which shall not exceed seven percent (7%) for each franchise location within the Development Area. Provided Developer has fully complied with the terms and conditions of this Agreement, including the full payment of the Development Fee, the initial franchise fees shall be as follows:

B.     The initial franchise fee payable under the franchise agreement executed for the first STORE pursuant to this Agreement shall be Fifteen Thousand Dollars ($15,000) and shall be deemed paid in full.

C.     The Three Thousand Dollars ($3,000) Development Fee for each STORE after the first STORE shall be credited toward the initial franchise fee for such STORE. The initial franchise fee balance of Twelve Thousand Dollars ($12,000) payable under the franchise agreement for each such STORE shall be made at the earlier of the time DEVELOPER executes a lease for (or purchases) a location for such STORE or sixty (60)

days before the date on which such STORE has been scheduled to open in accordance with the Development Schedule.

7.    **GRANT OF FRANCHISES**

Subject to the provisions of this Agreement, PO agrees to grant franchises to DEVELOPER for the operation of STOREs located within the Development Area as follows:

**A.**    DEVELOPER agrees to provide PO financial information, dated not more than forty-five (45) days prior to the date of this Agreement, and satisfactory in form and substance to PO, reflecting liquid net worth equal to or greater than Twenty-Five Percent (25%) of the Initial Investment (as set forth in PO's current Offering Circular provided to DEVELOPER) for the first STORE and Fifteen (15%) for each STORE after the first STORE. DEVELOPER further agrees to provide PO financial information, dated not more than sixty (60) days prior to the opening date of each subsequent STORE after the first STORE, according to the Development Schedule, reflecting liquid net worth equal to or greater than Twenty-Five Percent (25%) of the Initial Investment (as set forth in POs then current Offering Circular) for such STORE and Fifteen Percent (15%) for each STORE after such subsequent STORE. DEVELOPER understands and agrees that PO may refuse to grant DEVELOPER a franchise for a proposed STORE unless DEVELOPER, in POs reasonable judgment, has demonstrated sufficient financial capabilities to properly develop and operate the proposed STORE.

**B.**    DEVELOPER understands and agrees that the grant of a franchise for each subsequent STORE pursuant to this Agreement is subject to all DEVELOPER's currently open and operating STORES conforming to PO's then current standards for quality, cleanliness, appearance and service, and agrees that PO may refuse to grant DEVELOPER a franchise for a proposed STORE unless DEVELOPER, in PO's reasonable judgment, demonstrates the capabilities to operate all its then currently operating STORES in conformity with PO's standards.

**C.**    DEVELOPER shall submit to PO, in the form prescribed by PO, a description of the location as well as such other information or materials as PO may reasonably require to evaluate the acceptability of any location, and DEVELOPER's prospects for obtaining locations, at least one hundred and fifty (150) days prior to the date each STORE is due to be open and operating according to the Development Schedule. PO may accept or not accept any location submitted by DEVELOPER. PO will accept or not accept each proposed location by giving written notice to DEVELOPER within five (5) business days of the receipt by PO of the completed, required location information. PO will not unreasonably withhold acceptance of any location ("Location Acceptance") that meets its standards for STOREs. If DEVELOPER has not obtained lawful possession of an acceptable proposed location (the "Accepted Location") within sixty (60) days of delivery of Location Acceptance, PO may, at its sole discretion, withdraw such Location Acceptance.

D.      Within thirty (30) days of delivery of Location Acceptance, DEVELOPER agrees to submit a copy of the proposed purchase or lease agreement for the Accepted Location to PO for PO's  acceptance or non-acceptance.  PO's  acceptance or non-acceptance of the proposed purchase or lease agreement will be given by written notice within five (5) business days of PO's receipt of the proposed purchase or lease agreements.

E.      DEVELOPER shall receive, prior to or concurrent with the written lease acceptance notice, multiple copies of a Franchise Agreement for the Accepted Location and such other documents as PO then currently uses when granting franchises in form for execution by DEVELOPER (and if the Prospective Franchisee is a corporation or partnership, the Prospective Franchisee's owners, as applicable).  Prior to the execution of a lease for, or the purchase of, an Accepted Location, DEVELOPER (and the owners of the Prospective Franchisee, if the Prospective Franchisee is a corporation or partnership) shall enter into, with PO, a Franchise Agreement and, as applicable, such other documents delivered to DEVELOPER for the STORE to be developed at the Accepted Location together with the Franchise Fee due thereunder (if the franchise fee was not previously paid when otherwise due and payable according to Section 6.B).

F.      If DEVELOPER proposes to enter into a lease agreement for the Accepted Location, DEVELOPER shall provide PO a copy of the proposed lease agreement to PO according to this Section 7.D.  The lease shall conform to the requirements of the franchise agreement for that STORE.

(1)      That the premises shall be used only for the operation of the business franchised hereunder.

(2)      That the landlord consents to Franchisee's use of such Proprietary Marks and signage as PO may prescribe for the franchised business, subject, however, to local signage ordinances and landlord signage criteria as consistently applied to the Landlord's property, providing the same is a multi-tenanted property.

(3)      That the landlord agrees to furnish PO with copies of any and all letters and notices sent to Franchisee pertaining to the lease and the premises, at the same time that such letters and notices are sent to Franchisee.

(4)      That Franchisee may not sublease or assign all or any part of its occupancy rights, or extend the term of or renew the lease, without PO's prior written consent.

(5)      That PO shall have the right to enter the premises to make any modification necessary to protect PO's Proprietary Marks or to cure any default under the lease or under this Agreement.

(6)    That PO shall have the option to assume Franchisee's occupancy rights, and the right to sublease, for all or any part of its terms upon Franchisee's default or termination under such lease, or under this Agreement.

(7)    That the term of the lease shall be, with options, at lease ten (10) years.

(8)    If the STORE is to be located in a shopping center or other multi-tenant facility, the landlord agrees that it shall not lease other space within such facility, including any outparcel operated in conjunction with the facility, to any eat-in, take-out or delivery food service entity which has pizza items comprising more than twenty percent (20%) of its menu or representing more than twenty percent (20%) of its sales.

## 8.    PREREQUISITE TO RAISING EQUITY CAPITAL

A.    In the event DEVELOPER (or any of its owners) shall attempt to raise or secure funds by the sale of securities in a transaction pursuant to Regulation D of the Securities Exchange Act of 1934 or a uniform limited offering exemption under any state securities statutes or in any offering required to be registered under Federal or State securities laws (including, without limitation, common or preferred stock, bonds, debentures or general or limited partnership interests) in DEVELOPER or any affiliate of DEVELOPER, recognizing that the written information used with respect thereto may reflect upon PO, agrees to submit any such written information to PO prior to its inclusion in any offering circular, memorandum or prospectus. No information respecting PO or any of its affiliates shall be included in any securities disclosure document, unless such information has been furnished by PO, in writing, pursuant to the written request of the DEVELOPER, in which the DEVELOPER states the specific purposes for which the information is to be used. Should PO, in its sole discretion, object to any reference to PO or any of its affiliates or to any of their licensees in such offering literature, such literature shall not be used unless and until the objections of PO are withdrawn. PO assumes no responsibility for the offering whatsoever.

B.    DEVELOPER agrees to insert a bold-print message on the first textual page of any offering material stating "Pizza Outlet, Inc. has not been asked and has not passed upon the adequacy or accuracy of any statement made herein. Pizza Outlet, Inc. has not made any recommendation with respect to the quality, suitability or nature of the investment contemplated by the offering. Purchaser will not acquire any interest in Pizza Outlet, Inc. as a result of this offering."

C.    DEVELOPER and each of its owners must indemnify, defend and hold harmless PO and its affiliates, and their respective officers, directors, employees and agents from any and all claims, demands, liabilities, and all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in the defense of such claims, demands or liabilities arising from the offer or sale of such securities, whether asserted by a purchaser of any such security or by a governmental agency. PO shall have the right

(but not the obligation) to defend any such claims, demands or liabilities and/or to participate in the defense of any action to which PO or any of its affiliates or any of their respective officers, directors, employees or agents is named as a party.

      D.     DEVELOPER shall reimburse PO for its direct and indirect expenses, including without limitation, legal fees, in connection with the offering or proposed offering, not to exceed Five Thousand Dollars ($5,000).

## 9.    MANAGEMENT OF BUSINESS

      A.     DEVELOPER agrees to designate, in writing, an individual who shall supervise the day-to-day operations and development activities during the term of this Agreement (the "Principal Operator"). The Principal Operator shall hold at least ten percent (10%) in each of the STOREs opened pursuant to the Agreement and shall exert his full-time efforts to his obligations hereunder and shall not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility, time commitments, or which may otherwise conflict with DEVELOPER's obligations hereunder.

      B.     DEVELOPER'S Principal Operator and the General Manager, if requested by PO, one other management level individual, of each STORE franchised hereunder, must attend and successfully complete, to PO's satisfaction, PO's certified management training program. The foregoing personnel must be reasonably satisfactory to PO.

      C.     The Principal Operator must live within thirty (30) miles of the Development Area throughout the term of this Agreement. Following completion of the initial training program, the Principal Operator must act as the manager of the first STORE at least forty (40) hours per week for a period of six (6) months and be certified as a store manger.

      D.     Any entity, whether a corporation, partnership or otherwise, which is the DEVELOPER hereunder shall not engage in any business other than the development and operation of STOREs pursuant to this Agreement or any other agreements with PO.

## 10.    TERMINATION BY PO

      A.     DEVELOPER shall be deemed to be in default under this Agreement and all rights granted herein shall automatically terminate without notice to DEVELOPER upon the occurrence of any of the foregoing events:

          (1)     If DEVELOPER shall become insolvent or make a general assignment for the benefit of creditors; or (ii) if a petition in bankruptcy is filed by DEVELOPER or such a petition is not dismissed within ninety (90) days; or (iii) if DEVELOPER is adjudicated a bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of DEVELOPER or other custodian for DEVELOPER'S business or assets is filed

and consented to by DEVELOPER; or (iv) if a receiver or other custodian (permanent or temporary) of DEVELOPER'S assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or (v) if proceedings for a composition with creditors under any state or federal law should be instituted by or against DEVELOPER; or (vi) if a final judgment remains unsatisfied or of record of thirty (30) days or longer (unless supersedeas bond is filed); or (vii) if DEVELOPER is dissolved; or (viii) if execution is levied against DEVELOPER'S business or property; or (ix) if suit to foreclose any lien or mortgage against any of the STOREs premises or equipment is instituted against DEVELOPER and not dismissed prior to levy, but in no case later than thirty (30) days.

B.      DEVELOPER shall be deemed to be in default and PO may, at its option, terminate this Agreement and all rights granted hereunder without affording DEVELOPER any opportunity to cure the default, by delivering written notice of default to DEVELOPER, upon the occurrence of any of the following events:

(1)      DEVELOPER fails at any time to open and operate Stores in accordance with the Development Schedule in Exhibit "B".

(2)      DEVELOPER (or, if DEVELOPER is a corporation or partnership, any shareholder or partner of DEVELOPER) makes an unauthorized assignment or transfer of this Agreement or any interest in any STORE or Franchise Agreement granted pursuant to this Agreement.

(3)      A general partnership interest in DEVELOPER is terminated, for whatever reason, in the event this Agreement has been assigned to a partnership.

(4)      DEVELOPER has made any material misrepresentation or omission in its application for the development rights conferred by this Agreement, or is convicted of or pleads no contest to a felony or other crime or offense that may adversely affect the goodwill associated with the Proprietary Marks, or DEVELOPER conducts himself in a manner offensive to decency, morality, or social proprietaries, or becomes involved in a situation which degrades him in society or subjects either him, PO, or the system of STOREs to public disrepute, contempt or scandal.

(5)      DEVELOPER makes any unauthorized use of the Proprietary Marks or unauthorized use or disclosure of the Confidential Information.

(6)      DEVELOPER fails to comply with any provision of this Agreement.

(7)      DEVELOPER violates any covenant term, or condition contained in Section 15 of the franchise agreement attached hereto as Exhibit "C" or any franchise agreement hereinafter entered into between PO and DEVELOPER pursuant to this Agreement; or

(8)      DEVELOPER'S termination of a Franchise Agreement without cause.

Failure by PO to terminate this Agreement pursuant to this Section 10.B shall not constitute a waiver to terminate for subsequent violations.

## 11. EFFECT OF TERMINATION AND EXPIRATION

A.      Upon termination or expiration of this Agreement for any reason, DEVELOPER'S rights under this Agreement will terminate.  PO will thereafter have no further obligation to grant DEVELOPER additional franchises for STOREs (except as otherwise provided in Section 3.B hereof) and will be free to operate, or grant other persons franchises to operate, STOREs within the Development Area.

B.      All obligations of the DEVELOPER under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement and until they are satisfied in full or by their nature expire.

## 12. COVENANT NOT TO COMPETE

A.      DEVELOPER specifically acknowledges that, pursuant to this Agreement, DEVELOPER will receive valuable specialized training and confidential information, including without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of PO and the System.  DEVELOPER covenants that during the term of this Agreement, except as otherwise approved in writing by PO, DEVELOPER shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

(1)      Divert or attempt to divert any business or customer of the business franchised hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with PO's Proprietary Marks and the System.

(2)      Employ or seek to employ any person who is at that time employed by PO or by any other franchisee or developer of PO, or otherwise directly or indirectly induce such person to leave his or her employment.

B.      DEVELOPER covenants that DEVELOPER shall not, during the term of this Agreement and for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, and continuing for two (2) years thereafter, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person, persons, partnership or corporation, own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the franchised business, including without limitation, any pizza and/or any other prepared food delivery business, which business is, or is intended to be, in direct competition with the

nolan and gmbr  DC 6 stores DA.doc          11

STORE(S) or any other corporate, franchised or other  STORE, then in existence (including any successors to PO).

C.      Section 10.B(2) shall not apply to ownership by DEVELOPER of less than one (1%) percent beneficial interest in the outstanding equity securities of any publicly-held corporation.

D.      The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section 12 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PO is a party, DEVELOPER expressly agrees to be bound by any lesser covenant determined by such court, it being the intent to be bound by such covenant that imposes the maximum geographical and time duration permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 12.

E.      DEVELOPER understands and acknowledges that PO shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without DEVELOPER's consent, effective immediately upon receipt by DEVELOPER of written notice thereof; and DEVELOPER agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 12 hereof.

F.      DEVELOPER expressly agrees that the existence of any claims it may have against PO, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by PO of the covenants in this Section 12. DEVELOPER agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PO in connection with the enforcement of this Section 12.

G.      DEVELOPER acknowledges that DEVELOPER's violation of the terms of this Section 12 would result in irreparable injury to PO for which no adequate remedy at law may be available, and DEVELOPER accordingly understands that PO may seek the issuance of an injunction prohibiting any conduct by DEVELOPER in violation of the terms of this Section 12.

H.      At PO's request, DEVELOPER shall require and obtain execution of covenants similar to those set forth in this Section 12 (including covenants applicable upon the termination of a person's relationship with DEVELOPER) from any or all of the following persons:  (1) all managers of DEVELOPER and any other personnel employed by DEVELOPER who have received or will receive training from PO; (2) all officers, directors, and holders of a beneficial interest of one (1%) percent or more of the securities of DEVELOPER, and of any corporation directly or indirectly controlling DEVELOPER, if DEVELOPER is a corporation; and (3) the general partners and any limited partners (including any corporation, and the officers, directors and holders of a beneficial interest of one (1%) percent or more of the securities of any corporation which controls, directly or indirectly any general or limited partner), if DEVELOPER is a partnership. Every covenant

required by this Section 12 shall be in a form satisfactory to PO, including, without limitation, specific identification of PO as a third party beneficiary of such covenants with the independent right to enforce them. Failure by DEVELOPER to obtain execution of a covenant required by this Section 12 shall constitute a default under Section 10 hereof.

## 13.  ASSIGNMENT

A.    This Agreement is fully assignable by PO and shall inure to the benefit of any assignee or other legal successor to the interests of PO herein.

B.    DEVELOPER understands and acknowledges that the rights and duties created by this Agreement are personal to DEVELOPER, and that PO has granted this Agreement in reliance upon the individual or collective character, skill, aptitude, attitude, business ability, and financial capacity of DEVELOPER (or its shareholders or partners, if DEVELOPER is a corporation or partnership). Therefore, neither this Agreement (or any interest therein), nor any part or all of the ownership of DEVELOPER, nor any part of the development rights granted hereunder, may be voluntarily, involuntarily, directly or indirectly, assigned, sold, subdivided, subfranchised, or otherwise transferred by DEVELOPER or its owners (including without limitation, by consolidation or merger, by issuance of securities representing an ownership interest in DEVELOPER, by conversion of a general partnership to a limited partnership, by transfer or creation of an interest as a general partner of a limited partnership, by transfer of an interest in DEVELOPER or in this Agreement in a divorce proceeding, or in the event of the death of DEVELOPER or an owner of DEVELOPER, by will, declaration of or transfer in trust or the laws of the intestate succession), without the prior written consent of PO. Any purported assignment or transfer without such consent as required by this Section 13.B shall be null and void and shall constitute a material breach of this agreement for which PO may then terminate without cure pursuant to Section 10.B of this Agreement. Furthermore, DEVELOPER may not retain or otherwise contract with any entity which is not a party to this Agreement to provide oversight, management or administrative services for STOREs developed pursuant to this Agreement unless such entity is either an employee of DEVELOPER or has been approved in writing by PO. PO may condition such approval on the receipt of a Covenants Agreement from the principals of such entity as well as anyone attending any or all of PO's management training program.

C.    PO shall not unreasonably withhold its consent to a transfer of any interest in DEVELOPER or in this Agreement; provided, however, that if a transfer, alone or together with other previous, simultaneous or proposed transfers, would have the effect of transferring a controlling interest in the DEVELOPER or this Agreement, PO may, in its sole discretion, require any or all of the following as conditions of its approval:

(1)    All of DEVELOPER's accrued monetary obligations and all other outstanding obligations to PO, its subsidiaries, and its affiliates shall have been satisfied;

(2)     DEVELOPER is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between DEVELOPER and PO, or its subsidiaries and affiliates;

(3)     DEVELOPER shall have executed and delivered to PO a general release, in a form satisfactory to PO, of any and all claims against PO and its officers, directors, shareholders and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances;

(4)     The transferee shall enter into a written assignment, and in a form satisfactory to PO, assuming and agreeing to discharge all of the DEVELOPER's obligations under this Agreement; and, if the obligations of DEVELOPER were guaranteed by the transferor, the transferee shall guarantee the performance of all such obligations in writing in a form satisfactory to PO;

(5)     The transferee shall demonstrate to PO's satisfaction that it meets PO's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business franchised herein (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate the business, as set forth in Section 7 (a) of this Agreement;

(6)     The DEVELOPER shall also transfer any STOREs operating in the Development Area and owned by DEVELOPER in conjunction with all development rights granted hereunder. Transfer of partial development rights is prohibited;

(7)     The DEVELOPER shall have in operation in the Development Area at least one (1) STORE;

(8)     DEVELOPER shall remain liable for all of the obligations to PO in connection with the franchised business prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by PO to evidence such liability.

(9)     At the transferee's expense, the transferee, if the transferee is an individual, the transferee's General Manager, and one (1) other person to be employed in the STOREs and designated by the transferee, shall complete any training programs then in effect for franchisees upon such terms and conditions as PO may reasonably require;

(10)     Except in the case of a transfer to a corporation formed for the convenience of ownership or transfers among existing shareholders, DEVELOPER shall pay a transfer fee equal to Three Thousand and no/100 ($3,000.00) Dollars in addition to the transfer fees due under franchise agreement in effect pursuant to this Agreement to reimburse PO for its reasonable costs and expenses associated with reviewing the application to transfer, including, without limitation, legal and accounting fees.

## 14.   RIGHT OF FIRST REFUSAL

**A.**    Any party holding any direct or indirect interest in DEVELOPER or in this Agreement and who desires to accept any bona fide offer from a third party to purchase such interest shall notify PO in writing of each such offer, and shall provide such information and documentation relating to the offer as PO may require.  PO shall have the right and option, exercisable, within thirty (30) days after receipt of such written notification (along with all information and documentation relating to the offer), to send written notice to the seller that PO intends to purchase the seller's interest on the same terms and conditions offered by the third party.  In the event that PO elects to purchase the seller's interest, closing on such purchase must occur within thirty (30) days from the date of notice to the seller of the election to purchase by PO.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by PO as in the case of an initial offer.  Failure of PO to exercise the option afforded by this Section 14 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 14, with respect to a proposed transfer.

**B.**    In the event PO exercises its right of first refusal, the Agreement of Sale relating to such sale shall contain customary representations and warranties given by the Seller of the assets of a business or voting stock of any incorporated business, as applicable, including, without limitation, representations and warranties as to ownership, condition of and title to stock and/or assets, liens and encumbrances relating to the stock and/or assets and validity of contracts.

## 15.   WAIVER

**A.**    PO makes no warranties or guarantees upon which DEVELOPER may rely, and assumes no liability or obligation to DEVELOPER, by granting any waiver, approval, or consent to DEVELOPER, or by reason of any neglect, delay, or denial of any request therefor.  Any waiver granted by PO shall be without prejudice to any other rights PO may have, will be subject to continuing review by PO, and may be revoked, in PO's sole discretion, at any time and for any reason, effective upon delivery to DEVELOPER of ten (10) days prior written notice.

**B.**    PO and DEVELOPER shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation), the right to demand exact compliance with every term, condition and covenant herein, or to declare any breach thereof to be a default and to terminate this Agreement prior to the expiration of its term, by virtue of any custom or practice of the parties at variance with the terms hereof; any failure, refusal, or neglect of PO or DEVELOPER to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure, or omission by PO to exercise any right, power, or option, whether of the same, similar or different nature, with respect to any STOREs or any development or franchise agreements therefor; any grant of a Franchise

Agreement to DEVELOPER; or the acceptance by PO of any payment from DEVELOPER after any breach of this Agreement.

      C.    Neither PO nor DEVELOPER shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement, or instruction of any federal, state, or municipal government or any department or agency thereof; (2) acts of God; (3) acts or omissions of the other party; (4) fires, strikes, embargoes, war, or riot; or (5) any other similar event or cause which are force majeure in nature. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

## 16.   INDEPENDENT CONTRACTORS/INDEMNIFICATION

PO and DEVELOPER are independent contractors. Neither PO nor DEVELOPER shall be obligated by or have any liability under any agreements, representations, or warranties made by the other that are not expressly authorized hereunder, nor shall PO be obligated for any damages to any person or property directly or indirectly arising out of the operation of DEVELOPER's business conducted pursuant to this Agreement, whether or not caused by DEVELOPER's negligent or willful action or failure to act. PO shall have no liability for any sales, use, excise, income, gross receipts, property, or other taxes levied upon DEVELOPER or its assets or upon PO in connection with the business conducted by DEVELOPER, or any payments made by DEVELOPER to PO pursuant to this Agreement or any Franchise Agreement. DEVELOPER agrees to indemnify PO and its subsidiaries, affiliates, stockholders, directors, officers, employees, agents and assignees against and to reimburse them for all such obligations, damages, and taxes for which they are held liable and for all costs reasonably incurred by them in the defense of any such claim brought against them or in any action in which they are named as a party, including without limitation, reasonable attorneys' and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses. PO shall have the right to defend any such claim against it. The indemnities and assumptions of liabilities and obligations herein shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 17.   NOTICES AND PAYMENTS

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by certified or registered mail, return receipt requested, to the respective parties at the addresses set forth on page 1 of this Agreement, addressed in the care of PO, to Varol Ablak, President, unless and until a different address has been designated by written notice to the other party.

Any notice by certified or registered mail shall be deemed to have been given at the date and time of receipt.

18.  **ACKNOWLEDGMENTS AND COVENANTS**

    **A.**    DEVELOPER acknowledges that PO's approval of sites for STOREs and any information communicated to DEVELOPER regarding proposed sites do not constitute a representation or warranty of any kind, express or implied, as to the suitability of the proposed sites for STOREs or for any other purpose.  Such approval indicates only that PO believes that the particular sites fall within the acceptable criteria established by PO as of the time period encompassing the evaluation.  Both DEVELOPER and PO acknowledge that application of site criteria that have been effective with respect to other sites may not be predictive of potential for all sites and that, subsequent to PO's approval of a site, demographic and/or economic factors, including competition from other food service businesses, included in or excluded from PO's site criteria could change, thereby altering the potential of the site.  The uncertainty and instability of such criteria are beyond PO's control, and PO shall not be responsible for the failure of the site approved by PO to meet expectations as to potential revenue or operational criteria.

    **B.**    DEVELOPER acknowledges that in order to preserve and enhance the reputation and goodwill of all STOREs and the goodwill of the marks, all STOREs must be properly developed and operated.  Accordingly, DEVELOPER agrees that PO may refuse to grant to DEVELOPER a franchise for a proposed STORE, unless DEVELOPER meets the standard financial capability criteria as may be developed from time-to-time by PO.  To this end, DEVELOPER shall furnish to PO such financial statements and financial and other information regarding DEVELOPER and the development and operation of the proposed STORE (including, without limitation, pro forma statements and investment and financing plans for the proposed STORE as PO may reasonably require).

    **C.**    DEVELOPER understands and acknowledges the importance of PO's high standards of quality, cleanliness, appearance and service and the necessity of operating the businesses franchised hereunder in conformity with PO's standards and specifications as well as the necessity for protecting any proprietary information provided to DEVELOPER hereunder.

    **D.**    DEVELOPER acknowledges that he has conducted an independent investigation of the business contemplated by this Agreement and recognizes that, like any other business, the nature of the business conducted by STOREs may evolve and change over time, that an investment in a STORE involves business risks and that the success of the venture is largely dependent upon the business abilities and efforts of DEVELOPER.

    **E.**    DEVELOPER acknowledges that he has not received or relied upon, and PO expressly disclaims the making of, any warranty or guaranty, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement. DEVELOPER acknowledges that he has not received or relied on any representations about the franchise by PO, or its officers, directors, employees or agents, that are contrary to the statements made in PO's Franchise Offering Circular, which DEVELOPER

acknowledges receiving at least ten (10) days prior to the execution hereof, to the terms herein, and further represents to PO, as an inducement to its entry into this Agreement, that DEVELOPER has made no misrepresentations to PO in his application for the development rights granted hereunder. Notwithstanding the foregoing, the Earnings Claim set forth at Item 19 to PO's Offering Circular has been provided for informational purposes only and may not be relied upon or used against PO, its successors, assigns and affiliates.

## 19.  MISCELLANEOUS

**A.  Specific Performance/Injunctive Relief** Nothing herein contained shall bar PO's right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause it loss or damages, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions. DEVELOPER agrees that PO may have such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law.

**B.  Rights of Parties Are Cumulative** The rights of PO and DEVELOPER hereunder are cumulative and no exercise or enforcement by PO or DEVELOPER of any right or remedy hereunder shall preclude the exercise or enforcement by PO or DEVELOPER of any other right or remedy hereunder or which PO or DEVELOPER is entitled by law or equity to enforce.

**C.  Governing Law** This Agreement and all claims arising from the relationship between the DEVELOPER and PO shall be governed by the laws of the Commonwealth of Pennsylvania without regard to its conflict of laws principles.

**D.  Exclusive Jurisdiction** DEVELOPER and PO agree that any action arising out of or relating to this Agreement (including, without limitation, the offer and sale of this Agreement) and the relationship of the parties shall be instituted and maintained only in a state or federal court of general jurisdiction in Allegheny County, Pennsylvania, and DEVELOPER irrevocably submits to the jurisdiction of such court(s) and waives any objection he may have to either the jurisdiction or venue of such court.

**E.  Binding Effect** This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns, and successors in interest, and shall not be modified except by written agreement signed by both DEVELOPER and PO.

**F.  Construction**

(1)  The introduction and exhibit(s) are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between PO and DEVELOPER relating to the subject matter of this Agreement.

(2)     Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

(3)     The headings of the several sections and paragraphs hereof are for convenience only and do not define, limit or construe the contents of such sections or paragraphs.

(4)     The term "DEVELOPER" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine. If two or more persons are at any time DEVELOPER hereunder, their obligations and liabilities to PO shall be joint and several. References to "DEVELOPER" and "assignee" which are applicable to an individual or individuals shall mean the owner(s) of the equity or operating control of DEVELOPER or the assignee, if DEVELOPER or the assignee is a corporation or partnership.

(5)     This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed, sealed and delivered this Agreement on the day and year first above written.

DEVELOPER:                          **VOCELLI PIZZA LP**
                                    By: Pizza Outlet, Inc., its general partner

By:_____          By: _____

Title:_____          Title: _____

By: _____
    Burak S. Kotan, Individually

By: _____
    Mert Onur, Individually

EXHIBIT "B"

## TO VOCELLI® Pizza DEVELOPMENT
## AGREEMENT BY AND BETWEEN PIZZA OUTLET, INC.
## AND  BURAK S KOTAN AND MERT ONUR
## DATED  FEBRUARY 20th 2004

Development Fee:  THIRTY THOUSAND           ($30,000.00) Dollars.
Expiration Date:    JUNE 1, 2007

### MINIMUM DEVELOPMENT OBLIGATION

| STORE NUMBER | OPEN AND OPERATING ON OR BEFORE | INITIAL FRANCHISE FEE DUE EACH FRANCHISE AGREEMENT |
|:---:|:---:|:---:|
| 1 | December 1, 2004 | Paid |
| 2 | June 1, 2005 | $12,000 |
| 3 | December 1, 2005 | $12,000 |
| 4 | June 1, 2006 | $12,000 |
| 5 | December 1, 2006 | $12,000 |
| 6 | June 1, 2007 | $12,000 |

DEVELOPER:

By:_____

Title:_____

By:_____
   Burak S Kotan, Individually

By:_____
   Mert Onur,  Individually

**VOCELLI PIZZA LP**
By:  Pizza Outlet, Inc., its general partner

By:_____
   Varol Ablak, President & CEO

kotan and onur - DC & stores DA.doc

## EXHIBIT "A"

### TO
### VOCELLI® Pizza DEVELOPMENT AGREEMENT
### BY AND BETWEEN
### PIZZA OUTLET, INC.

### AND__BURAK S. KOTAN AND MERT ONUR

### DATED_FEBRUARY _20th_, 2004

The Development Area referred to in Section 1 of the captioned agreement shall be:

The Western portion of the District of Columbia to include zip codes 20015, 20016, 20008, 20007, 20009, 20063, 20036, 20037, 20006, 20004, 20005, 20001 in their entirety. In addition, portions of zip code 20010. The area is more specifically outlined on the attached map.

**DEVELOPER:**

By:_____

Title:_____

By:_____
    Burak S Kotan, Individually

By:_____
    Mert Onur, Individually

**VOCELLI PIZZA LP**
By: Pizza Outlet, Inc., its general partner

By:_____

Title:_____

kotan and onur - DC areforme DA.doc

20

# VOCELLI PIZZA          Approved Smallwares List - NSO

| Line # | Reinhart Code | Description | Size | Supplier | Recommended Qty | Item Cost | Opening Cost |
|---|---|---|---|---|---|---|---|
| 1 | 77674 | Screen 10" | 12/cs | Ammet | 2 | 22.98 | 45.98 |
| 2 | 91380 | Screen 14" | 12/cs | Ammet | 6 | 30.47 | 182.82 |
| 3 | C7288 | Delivery Hot Bag - 2 pie (Vocelli) | ea | po | 30 | 21.90 | 657.00 |
| 4 | C7290 | Delivery Hot Bag - 5 pie (Vocelli) | ea | po | 4 | 25.60 | 102.40 |
| 5 | 88282 | Sauce tub 12 qt | ea | Cambro | 12 | 6.11 | 73.32 |
| 6 | 88300 | Lid for 88282 | ea | Cambro | 12 | 3.25 | 39.00 |
| 7 | 94486 | Sheet tray 18x26 | 12/cs | Advanc | 1 | 52.27 | 52.27 |
| 8 | 85650 | Sub tray 9x13 | 12/cs | Lincoln | 2 | 40.45 | 80.90 |
| 9 | 91082 | Mixing bowl (corn meal) | ea | Volrath | 2 | 5.71 | 11.42 |
| 10 | 85112 | Prep container 2 qt | ea | Cambro | 6 | 4.47 | 26.82 |
| 11 | 85050 | Cover for 85112 | ea | Cambro | 6 | 2.81 | 16.86 |
| 12 | 88088 | Full Size pan | ea | Cambro | 4 | 11.65 | 46.60 |
| 13 | 04594 | Cover, 1/2 pan | 6/cs | Cambro | 2 | 7.25 | 14.50 |
| 14 | 88070 | Pan, 1/2 size 6" deep | ea | Cambro | 10 | 7.54 | 75.40 |
| 15 | 88068 | Pan, 1/2 size 4" deep | ea | Cambro | 2 | 6.29 | 12.58 |
| 16 | 88062 | Pan, 1/2 size 2" deep | ea | Cambro | 2 | 6.59 | 13.18 |
| 17 | 87094 | Pan 1/3 size 6" deep | ea | Cambro | 18 | 6.19 | 111.42 |
| 18 | 90684 | Pan, 1/3 size 2.5" deep | ea | Volrath | 1 | 8.57 | 8.57 |
| 19 | 67092 | Lid for 1/3 pan | ea | Cambro | 1 | 4.00 | 4.00 |
| 20 | 87100 | Pan, 1/6 size 6" deep | ea | Cambro | 12 | 4.84 | 58.08 |
| 21 | 87098 | Pan, 1/6 size 4" deep | ea | Cambro | 6 | 4.13 | 24.78 |
| 22 | 81170 | Pan, 1/9 size 4" deep | 6/cs | Cambro | 1 | 16.28 | 16.29 |
| 23 | 39600 | Drain 1/2 size | 6/cs | Cambro | 1 | 15.45 | 15.45 |
| 24 | 90738 | Adapter Bar | ea | Volrath | 12 | 4.56 | 54.72 |
| 25 | 41664 | Spray Bottle | 3/count | Crimfg | 1 | 4.66 | 4.66 |
| 26 | 97410 | Squeeze Bottle 32oz. | 12/cs | Tablac | 1 | 13.83 | 13.83 |
| 27 | 90613 | Romano Cheese shaker 12oz. | ea | Tablac | 3 | 3.94 | 11.82 |
| 28 | 86564 | Bottle, 1/2 gal | ea | Carlis | 2 | 3.82 | 7.64 |
| 29 | 88798 | Pump kit for 86564 | ea | Tablac | 3 | 6.45 | 19.35 |
| 30 | 89348 | Cutter 4" | ea | Dexter | 4 | 12.28 | 49.12 |
| 31 | A3774 | Peel, aluminum | ea | Ammet | 2 | 7.09 | 14.18 |
| 32 | 85668 | Spoodle 4oz. | ea | Volrath | 2 | 4.16 | 8.32 |
| 33 | 90460 | Dough Cutter - metal | ea | Mndial | 1 | 8.75 | 8.75 |
| 34 | 59508 | Dough Scraper - plastic | ea | Wth | 2 | 5.50 | 11.00 |
| 35 | 58143 | Tongs 12" | ea | Tablac | 2 | 3.24 | 6.48 |
| 36 | 40848 | Knife 12" scalloped | ea | Dexter | 3 | 16.33 | 48.99 |
| 37 | 59612 | Bubble Pork (special order) | ea | Ammet | 1 | 8.97 | 8.97 |
| 38 | 88458 | Pastry Brush | ea | Carlis | 3 | 6.65 | 19.95 |
| 39 | 89460 | Tomato Corer | 2ct | Redco | 1 | 3.88 | 3.88 |
| 40 | 91288 | Docker | ea | Ammet | 1 | 18.21 | 18.21 |
| 41 | 90809 | Spatula, rubber | ea | Volrath | 3 | 3.50 | 10.50 |
| 42 | 91868 | Thermometer, hanging | ea | Cooper | 3 | 3.05 | 9.15 |
| 43 | 76016 | Thermometer, stem | ea | Cooper | 3 | 5.75 | 17.25 |
| 44 | 97984 | Scale, ounce | ea | Edlund | 1 | 127.15 | 127.15 |
| 45 | 91956 | Scale, pound | ea | Edlund | 1 | 128.10 | 128.10 |
| 46 | 88236 | Oven Glove | 1pr | Best | 1 | 8.00 | 8.00 |
| 47 | A3772 | Rack, Wire 15 shelf | 2ci | Ammet | 3 | 51.54 | 154.62 |
| 48 | 67822 | First Aid Kit - 25 people | ea | Impact | 1 | 33.98 | 33.98 |
| 49 | 91758 | Can Opener #1 | ea | Edlund | 1 | 59.85 | 59.85 |
| 50 | 91764 | Plate for #1 can opener | ea | Edlund | 1 | 12.85 | 12.85 |
| 51 | 98712 | Check minder 36" | ea | Carlis | 2 | 16.40 | 32.80 |
| 52 | 24560 | Menu Holder | ea | po | 1 | 15.90 | 15.90 |
| 53 | 89182 | Dispenser, soap | ea | PHS | 3 | 5.48 | 16.44 |
| 54 | 89435 | Kit - Pan & Lid  10 count | ea | po | 1 | | |
| 55 | 91290 | Pan Gripper | ea | Ammet | 2 | 3.64 | 7.28 |
| 56 | A4676 | Trash can - 44 gal | ea | Conti | 2 | 23.01 | 46.02 |
| 57 | A4678 | Lid for A4678 | ea | Conti | 2 | 9.56 | 19.12 |
| 58 | A4648 | Dolly for A4676 | ea | Conti | 2 | 23.46 | 46.92 |
| 59 | 97480 | Broom - Corn | ea | Packer | 1 | 4.74 | 4.74 |
| 60 | 97488 | Sweeper - 18" (broom head) | ea | Carlis | 1 | 8.37 | 8.37 |
| 61 | A4698 | Dust Pan (heavy duty) | ea | Rubbermaid | 1 | 3.76 | 3.76 |
| 62 | 97452 | Handle, 60" metal tip threaded | ea | Carlis | 2 | 5.02 | 10.04 |
| 63 | 88388 | Scrubber - 10" (deck brush) | ea | Carlis | 1 | 7.88 | 7.88 |
| 64 | 39653 | Mop Head, cotton 4 ply | ea | Conti | 2 | 4.07 | 8.14 |
| 65 | 97390 | Handle  mop | ea | Zephyr | 1 | 5.39 | 5.39 |
| 66 | 61938 | Mop Bucket w/wringer | ea | Conti | 1 | 36.24 | 36.24 |
| 67 | 82288 | Dispenser, roll towels | ea | FtJames | 3 | 1.96 | 5.88 |

Special Order Items
JOHN PINES DOUGH DOLLIES
Estimated Cost plus freight & tax

TOTAL  $    2 831.84
                    1 752.00
              $     4 583.84

225

| Dough Trays | 120 | 13.00 | 1,560.00 | Franchisee needs to |
| Dough Dollies | 6 | 32.00 | 192.00 | order these through |
| Napkin Dispenser | | | | John Pine |
| Cottonseed Oil Pump | | | | |

**EXHIBIT 2**

-



May 9, 2005

**Via Certified Mail: 7003 2260 0002 9169 6722**

John M. Shoreman
McFadden & Shoreman, LLC
1800 L Street, N.W., Suite 802
Washington, DC 20036
Phone: 202 638-2100
Fax:    202 638-6783

RE:  Burak Kotan & Mert Onur, DC Development Agreement

Dear Mr. Shoreman:

We are in receipt of your letter of April 27, 2005 requesting recovery of Mr. Kotan's development fee for the DC area. On February 20th, 2004, Mr. Kotan and Mr. Onur entered into a Development Agreement with Vocelli Pizza. In section 5 (Development Fee), the agreement clearly states that the development fee is non-refundable if the franchisee fails to open stores according to the schedule specified in the agreement.

The agreement required the first store to have been opened by December 1st, 2004, with the second store scheduled to open no later than June 2, 2005. When Mr. Kotan and Mr. Onur failed to open their first store as scheduled, on September 30th, 2004, Vocelli Pizza granted an extension of six months to June 1st, 2005, as a gesture of good faith. As of the date of this letter, Vocelli Pizza has received no indication of Mr. Kotan & Mr. Onur's good faith effort to secure a lease, let alone open a store.

The Development Agreement between Mr. Kotan and Mr. Onur and Vocelli Pizza called for two stores to be opened by June 2, 2005. Their failure to do so has cost Vocelli Pizza franchise fees, royalty income, exposure and brand recognition. Furthermore, Mr. Kotan is in default of the Development Agreement by failing to provide written evidence to Vocelli Pizza of an agreement between Mr. Kotan and his Partner (Mr. Onur) as required in the Development Agreement, Section 9 (MANAGEMENT OF BUSINESS), Paragraph A.

As a result of Mr. Kotan's failure to comply with the terms of the agreement, significant income has been denied to Vocelli Pizza. Since Mr. Kotan has neither presented to Vocelli Pizza any evidence that he has made a good faith effort to comply with the terms of the agreement by taking steps to open stores, nor provided evidence of an Agreement between him and his Partner, Vocelli Pizza will exercise its full rights under the agreement by terminating the Development Agreement between Mr. Kotan & Mr. Onur and Vocelli Pizza on June 2, 2005. This termination will result in the forfeiture of franchise and development fees paid to Vocelli Pizza as provided for in the Franchise and Development Agreements.

Sincerely,

Bob Montanari
Director of Franchise Sales


cc:     Varol Ablak
        Don Morrison
        Rick Krouse

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 1ˢᵗ day of June, 2005, copies of the foregoing Application for an Ex Parte Temporary Restraining Order, with accompanying memorandum of Points and Authorities, Affidavit and Exhibits, and proposed Order, were sent by facsimile to the following:

        Pizza Outlet, Inc.
        112 Abbeyville Road
        Mount Lebanon, PA  15228
        (via UPS)

        Vocelli Pizza , LP
        2102 Greentree Road
        Suite A-202
        Pittsburgh, PA  15220

                                      _____
                                    Athan T. Tsimpedes